Good morning, I'm Tom Lundy on behalf of Mendes Brown. Initially, quick point of clarification, I assume I have 10 minutes, I talked, that's what the clerk told me, that notice I got said that I would have 20, but the 10 is correct? 10 minutes is correct. Okay, great, great. I'd like to reserve two minutes for rebuttal, please. Keep track of that timer in front of you, see that? Okay, all right, thank you. This is a case about intentional racial discrimination in the judicial process. This court is being asked to decide under what circumstances such discrimination casts a sufficient pall over the integrity of the judicial process to implicate equal protection and or due process principles. In the State court, there was dramatic evidence of racial discrimination. Even though there were a proportionate representation of Chinese American and Hispanic Americans on the jury, for a period of 36 years, prior to Mr. Mendes's indictment, not one Hispanic or Chinese American was ever selected. The district judge, additionally, going to the one other aspect of the evidence presented at the State hearing, two experts who were uncontroverted testified that the chances of having such a disparity, such a racial disparity, such an underrepresentation in the judicial process, was extremely low. One of them said that it was three and eight million. The other said that it was .0003% chance of happening by any means other than intentional discrimination. Mr. Lundy, were there any Chinese Americans on this grand jury that indicted Mr. Brown? I believe there were, but I'm not certain on that, Your Honor. I have that there was a, and I'm not 100% positive of this, but I hope you can help me confirm it. I have that there was a Hispanic gentleman, age 73, and there was a Filipino lady who had an Associate of Arts degree, but I don't see any indication that there was any Chinese Americans on this grand jury. That may be so. If that's true, then what are we supposed to do about the fact that there may have been in previous years discrimination against Chinese Americans? In this particular grand jury, there is no Chinese American who was excluded from being a foreperson because there wasn't one on the panel. Because the focus under U.S. Supreme Court precedent is not on the jury, the grand jury that actually indicted the defendant. The focus is on the statistical showing that was made under Castaneda. So that means that 50 years ago there was discrimination against Chinese Americans. We don't look to see who was on or who was not on this particular grand jury? No, no. Under Castaneda, what you look at is the statistical showing that was made at the hearing. And in this case, the statistical showing that was made was that there was intentional discrimination over the last 36 years. Does that seem a little removed from the facts, though, if there is no Chinese American on the panel and no claim that a Chinese American was kept off the panel? I mean, if you had a Chinese American on this particular grand jury, it seems to me your argument makes some sense with respect to Chinese Americans. If there are no Chinese Americans on this grand jury and no one challenges the lawfulness of that fact, then I don't know what we make of what we're supposed to do. Well, what you're supposed to do is look to U.S. Supreme Court precedent, which says that when there's intentional discrimination, that's a violation of equal protection. And what was shown here and what was found by the trial judge was that there was a prima facie showing of intentional discrimination over this 36-year period. And that intentional discrimination is such an affront to our system that it in itself is a basis for granting relief. And that's what Vasquez says. That's what Rose says. There's a long line. There's a 100-year line of U.S. Supreme Court precedent that says in the area of intentional racial discrimination, we don't look to the specific case. We don't look to the specific source of prejudice or harmlessness. We look to the pattern of discrimination. Well, I mean, you're completely disregarding the Hobby case, aren't you? Hobby was a due process case. We're talking about equal protection here. And there are actually two claims that were made. One is equal protection. One is due process. Well, Hobby bears on it in this sense, doesn't it? To pursue an equal protection claim, don't you have to show some, you know, some injury? No. Absolutely not under Hobby. Hobby is a due process case, and what it said is in order to show a violation of due process, you have to show unfairness as to the actual panel. And the way you do that is so that the juror, the grand juror was more than a ministerial person. For equal protection purposes, the Hobby is inapplicable. The applicable case in our situation is Campbell v. Louisiana because that is the case that Judge Henderson relied on to find a lack of standing. And Judge Henderson said that there's no standing under Campbell for equal protection purposes because no matter how invidious the discrimination, according to Judge Henderson, he didn't care how invidious it was, how intentional it was, we could have shown one in a billion chances. And it still wouldn't have been enough because according to Judge Henderson, Campbell requires the defendant to be the same race as the excluded group. And there's two problems with that. The first problem is I think that that holding does not follow from Campbell. Campbell involved a different situation. It involved a situation where the grand juror was actually selected to be a grand juror at the same time he was selected to be the grand jury foreperson. It didn't deal with our situation where the foreperson is selected from among the sitting grand jurors. But it also didn't deal with the intentional discrimination that we have in our situation. And I would submit that it's not necessary for the defendant to be from the same group if there's intentional discrimination. What if you had a court where every bailiff and every interpreter and every reporter was intentionally selected from a certain class or a certain race? And couldn't somebody from another race come in and say this is an affront to the judicial process? I think they could, and I think the U.S. Supreme Court precedent that I've cited would establish that. But the second reason that Judge Henderson's ruling is wrong is that in California, the foreperson is not ministerial. The foreperson has real powers and duties. And so you don't even have to reach the first question that we've been talking about, about whether or not intentional discrimination against a ministerial person violates the Constitution, because in this case, the person was not ministerial. And there were three major powers or duties that the California foreperson has, two of which Judge Henderson didn't even discuss. And the third, he was laboring under three false assumptions. The first is the veto power of the foreperson. And this is a critical point, and I only have a minute and a half left here, but I have to make this, really take the time to make this point. The Attorney General, does California law allow, in your view, a foreperson to ignore the duty to sign the indictment if voted on by his fellow grand jurors? It doesn't allow him not to. And it anticipates that he may not, because it has a specific statute. Right. Can you have a single case in which that's occurred? No, but I don't think it's our obligation. If we have a statute, I think we're entitled to a presumption that the statute, that the State follows its own statutes. But in reading the statute, it seems to me that it's mostly ministerial because the endorsement must be signed by the foreman of the grand jury. It doesn't give the foreman, the foreperson, I should say, discretion on whether to sign it or not. Then why did they enact 995a1a, which says that if it's not signed, it must be dismissed, must be dismissed. Why is 995 not enacted? Because it's ministerial. Well, they don't need 995 if it's ministerial. If he has to sign it, then they don't need 995. But 995 would have greater force for me if the statute said the foreperson has the discretion to sign the bill or not. You have eight seconds left. Okay. Well, I would just say that you need to read the statutes together. And if you read 995 with the indictment statute, you read them together, it anticipates, it assumes that there will be situations where it's not signed. And how that happens, we don't know. You have no case where that's ever happened, right? Pardon? You can't cite a case where that's actually happened. Well, and the AG can't cite a case where it has happened. It hasn't happened. And who's the burden on the prime? We made a prima facie showing at trial. They have the burden. But this is the question of statutory construction, whether or not it's ministerial or not, whether or not the foreperson has the discretion. But it's not a question of statutory construction if you're saying as a practice that it has to be dismissed if it's not signed. But as a practical matter, you're saying that it never happens. We don't know that. That's apart from the statute. All we're saying is within the statutory scheme, there is an assumption that it will happen, because there's a provision for dismissal when it doesn't. All right. Thank you, Mr. Lundy. You can't just read that out of the bill. Thank you, Mr. Lundy. Okay. Thank you. All right. Good morning. Gregory Ott for Respondent. I'd like to first address a point that Judge Silverman made. That is in regards to the absence of Chinese on this panel. As I read the record, there were no Chinese Americans on this panel. The only members of the allegedly excluded groups that were on this panel were one Hispanic and one Filipina American. The significance of the absence of a Chinese on this panel means that there can be no relief for the exclusion of Chinese. What Petitioner, what Appellant is trying to show with the history is what it all comes down to is was there discrimination in the selection of his grand jury for a person? If there wasn't discrimination in the selection of his, then he's essentially seeking a basis. That just cannot be the result. He's using a statistical history in an attempt to show discrimination in his case. The significance of that or another significant point that comes off of that is the fact that individual judges, several individual judges acting independently, chose these jurors. Judge Vigoni, who chose the grand jury for a person in this case, has chosen no more than three. With one exception, all the judges have chosen no more than three grand jury for a person. Also, those selections are not contiguous. These were not judges acting three years in a row and making several selections. These were several years apart. We have to assume that all of these presiding judges individually discriminated specifically and only against Chinese, Hispanic, and Filipina, not Japanese, not blacks, not gender. These three groups, all of them. Judge Vigoni, however, who chose the grand jury in this case, only chose three. The impact of that statistical survey lasting 30-some odd years has much less power when you consider that. He does have to show discrimination in this case. What he's left with is a Hispanic on this jury. Did you make this argument to the district court? Which argument? The one you're making right now. That he had to show discrimination in this case? I believe so. That's not the basis of a – that wasn't the basis of Judge Henderson's decision, right? No. No, it wasn't. Judge Henderson's decision was essentially that the prima facie case was rebutted. And going into that, the Castaneda – Castaneda is not really relevant anymore. We have never disputed that the three-part Castaneda test was met. A prima facie case was shown. These statistics do give pause. Our argument has been all along that that case, that prima facie case, was rebutted at the evidentiary hearing in state court. And so the Castaneda factors really aren't an issue anymore. And the prima facie case was rebutted, as Judge Henderson found. As I – the first and most significant point is that the selections were made by individual judges acting individually, rotating each year. The testimony of the grand jury advisor and the superior court executive officer made clear that race wasn't a factor. It wasn't mentioned. They didn't perceive it. Their testimony was found credible. There was discussion of the process being race-neutral. There was a questionnaire that was used, which does objectify the process to the extent it can be. Input from the advisor Coleman and Tammany helped eliminate or helped provide an opportunity to challenge any bias that a judge might express, if it was expressed. There again, they testified that they never perceived any and that it wasn't ever mentioned. The judges' selections for race – the judges' reasons for the selections were race-neutral. There was no use of the usual ambiguous terms like moral, upright, appropriate, punctuality, people skills, leadership. And these were things that had to be viewed in person. At some point, it's like the resume before the job. The questionnaire is submitted, but somebody may look good on paper, but when you see them, you hear them articulate, you see whether they show up on time. These things can't be determined by the questionnaire alone. The judge has to see these people, and they do see them. And like I say, the reasons that were given were racially neutral. Administrative skills, work experience. There was one example of an insurance adjuster who had quite a bit of experience with paperwork and was very outgoing. Moving to the due process issue, I want to address this veto power. This is a term that was manufactured by appellant. You won't find California case law referring to a veto power over an indictment. This is a theoretical possibility that might not even occur to a grand jury foreperson, let alone is there any suggestion that it's ever happened. What remedies would the state have if you had an affirmative vote of the grand jury and the foreperson decided not to sign it? I mean, if it's truly ministerial, then one would think that you would have some remedies, but it doesn't appear that there are any remedies for this. I don't know. And this is one of the difficulties with we're looking at fairly obscure statutes, that there isn't a lot of California case law on. I did the same survey when I was trying to compare the obligations of the grand jury foreperson in the federal system. There isn't a lot of case law. I think it comes down to a lot of experience with the trial judges and what happens in practice, and that may not be documented in court of appeal opinions. I don't know. The statute, and I can't remember which statute it is, does indicate that it must be set aside. Whether it can be resubmitted for signature, I don't know, and I haven't seen any case law. That's the only thing short of it being set aside that I can think of, that the possibility that it could be resubmitted to the grand jury. Hey, you didn't sign this. Please do so. Couldn't the DA just simply bring the foreperson before the presiding judge and the judge say you signed it or I'm going to hold you in contempt or something like that? Well, I suppose that's another example of what I'm saying is resubmit it. Either bring the panel in, bring the foreperson in, and ask them to do it as required by statute. And if not, hold them in contempt. I don't recall if there's a remedy in the statute. There is for some of the obligations, at least. I don't recall if there is for the signing of the indictment. The other option also is, of course, going to a preliminary hearing. It's just another procedure. But I suppose that would still result in setting aside the indictment. If you're going to set aside the indictment, that's a good preliminary hearing. These other powers that appellant has raised are no more substantive than their federal counterparts. The duty to excuse biased jurors. If you have a biased juror, the court's obligated to excuse them. It's presumed they're going to be excused. And neither party benefits or is harmed by the exclusion of a biased juror. Depending on how you view bias. Well, it can be biased for either party. Or biased for any party. No, I mean, the cases we see on a biased juror, they tend to be biased in favor or opposed to one party or the other. The claims we usually see are people who say, I think the defendant is innocent, and then somehow gets excused from the jury, and there's a conviction. Now, if a grand jury foreperson said, everybody who thinks that we shouldn't indict is excused for bias, that would seem to be a fairly significant power to exercise. It would be. But when we start making assumptions like that, I think we're beginning to assume an abuse of the grand jury foreperson. I don't know. We're just talking about whether this is a discretion or a mandatory duty and to what extent the foreperson has power. I mean, that was just a straight statutory construction. I'm not to – obviously, we don't have any allegations of that in this case. Well, no, Your Honor. I guess the point I was making was that would be an improper excusal, or if you're excusing simply because somebody doesn't believe they should be indicted. Right. What's the remedy for that? Well, I – There isn't any, as far as I can tell. I don't know that there is one. Pardon me? Except to contest the conviction. Yes, I don't know that there is one. But the power itself, when you're looking at the power just on its face, I don't think that's a substantive rule. And Judge Henderson noted that this wasn't sufficiently different from the Federal counterpart's role or obligation, which goes back to my – I've run out of time here, but I didn't find any authority one way or the other on that particular issue. But if the Court has no further questions, I'll submit it. You've made the points in your briefs. Thank you. All right. Thank you very much. Thank you. All right. This case is submitted for decision. We thank both counsel. The next case on the argument calendar is – I believe it's Cower versus – yes, Cower versus Ashcroft.
judges: Tashima, Thomas, Silverman